IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | |
|---|---|
| IRENE LOCKE, | ) |
| | ) |
| | ) 2:18-CV-01260-MJH |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JEFFERSON HILLS MANOR, | ) |
| | ) |

Defendant,

OPINION

Plaintiff, Irene Locke, brings the within claims for damages under Title VII retaliation (Count I) and Section 1981(Count II) against her former employer, Defendant, Jefferson Hills Manor ("Jefferson"), stemming from her discharge.

Jefferson moves for partial summary judgment pursuant to Fed. R. Civ. P. 56 seeking judgment as to Count I only. (ECF No. 44). The parties provided briefs, concise statements of material facts, and exhibits. (ECF Nos. 43-49, 52, 55-56). The matter is now ripe for decision.

For the following reasons, Jefferson's Motion for Partial Summary Judgment will be granted. Summary Judgment as to Count I will be granted in favor of Defendant, Jefferson Hills Manor.

I.   Background

Ms. Locke, an African American, worked at Jefferson as a Certified Nursing Assistant from February 9, 2016 through March 1, 2018. (ECF No. 43 at ¶¶ 1-2). Jefferson is a skilled rehabilitation and long-term care facility. *Id.* at ¶ 3. During her tenure, Ms. Locke worked the 3:00 p.m. to 11:00 p.m. shift. (ECF No. 48-1 at p. 13). Her duties included walking around with the prior shift, making sure the residents were clean and dry, passing out ice and snacks, and

ensuring the residents' activities of daily living were met. *Id*. at p. 13.   During the relevant time period, Maximilian Bondi served as Jefferson's Administrator, and King Matulula served as its Director of Nursing.  (ECF No. 43 at ¶¶ 4-5).  Ms. Locke directly reported to King Matulula. (ECF No. 48-1 at p. 14).

In her Complaint, Ms. Locke avers that Jefferson pretextually terminated her on March 1, 2018, because she allegedly engaged in misconduct with a patient. (ECF No. 1 at ¶ 22).  Ms. Locke denies any such misconduct and alleges that her termination was an unlawful retaliation because she engaged in two categories of protected activities:  1) a November 27, 2017 charge to the Pennsylvania Human Relations Commission ("PHRC"); and 2) internal complaints of discrimination.  *Id*. at ¶¶ 20-24.

With regard to the PHRC charge, Ms. Locke produced a PHRC questionnaire and an unsigned PHRC amended complaint, but there is no evidence or documentation that she formally filed a PHRC charge prior to her termination. (ECF No. 43-9).  Jefferson denies it ever received any notice from either Ms. Locke or the PHRC of a charge filed before her termination.  (ECF No. 43 at ¶ 23).  Both Bondi and Matulula also affirm that neither received any notice from the PHRC prior to their decision to terminate Ms. Locke. (ECF Nos. 46 and 47).   Ms. Locke has produced no evidence that she or the PHRC transmitted to Jefferson any documents regarding a charge of racial discrimination.  However, Ms. Locke testified that she informed both Bondi and Matulula of her intent to file a charge with the PHRC prior to the date Jefferson terminated her. (ECF No. 48-1 at pp. 18-19, 23, 26-27).  In her conversations with Bondi and Matulula, Ms. Locke stated to them that she was filing a charge with the PHRC because she had been "discriminated against;" however, she did not specify that it was because of race. *Id*. at pp. 20 and 22.

With regards to her assertions of having made various internal complaints to Biondi and Matulula, such are best categorized as workplace conflicts with her Caucasian co-workers. All such complaints occurred before her termination.   On one occasion, Ms. Locke testified that, when she was in Bondi's office regarding an incident where she had been accused of not changing a resident, she told Bondi, "I feel like I am being discriminated against, because I am being written up for someone saying I didn't change a resident, and I did not work that weekend." *Id*. at pp. 22, 23, and 57.  During said meeting, Ms. Locke requested contact information from Bondi for the ombudsman. *Id.* at pp. 21-22.  In response, she asserts that Bondi directed her to the number on a hallway sign. *Id*. at pp. 21.   She testified that she did not call the ombudsman's number; rather, she emailed corporate.  *Id*. at pp. 28-29, 33.  She testified that her email contained an explanation about her interactions with Caucasian female coworkers from the 7:00 to 3:00 shift and how they felt she was harassing them because Ms. Locke would complain about their work performance to Matulula, and vice versa.  *Id*. at pp. 30-32.  Ms. Locke's testimony about the email's content does not include any reference to racial discrimination.  Her only mention of race was in her factual description of her co-workers as Caucasians.  Further, Ms. Locke did not produce a copy of the email in discovery even though defense counsel requested it.

Ms. Locke also testified that she felt discriminated against because she was always being called into the office in response to her co-workers' complaints about her; but, when she had complained about them, Mr. Matulula did nothing about her complaints. She testified that she told Matulula that he was always "sticking up" for and favoring the 7:00 to 3:00 shift; however, when questioned about this further, she conceded that she did not know whether Matulula ever called them into his office.  *Id*. at pp. 32-33, 63-66.  In her testimony, recalling her conversation

3

with Matulula, she does not indicate that she referred to her co-workers as Caucasians or that she made any specific reference to race.

Regarding other internal complaints, Locke testified that, on November 20, 2017, when she was questioned about an incident from November 18, 2017 where she had allegedly slammed doors and yelled that residents could "drink their own spit," she also lodged an informal complaint to Bondi, about "discrimination." *Id*. at pp. 40-41, 57.  In her deposition, she testified that she was harassed by the 7:00 to 3:00 shift, and that she believed the harassment by two Caucasian co-workers was based upon race. *Id*. at pp. 57-58.  However, Ms. Locke denied that anyone from the 7:00 to 3:00 shift ever made a racial remark to her. *Id*. at pp. 58, 64.  Ms. Locke has also produced no evidence that she complained to Jefferson management that a co-worker harassed her based upon race.

In another incident, Ms. Locke testified that in January 2018, she was summoned to meet with Bondi and Matulula because a co-worker named Sirenna complained that Locke had harassed her. *Id.* at pp. 35-36.  Ms. Locke testified that she told both Bondi and Matulula that she felt she was "being discriminated against" because they had called her in to discuss this alleged harassment. *Id.* at p. 38.   Again, her testimony does not reflect that she referenced any discrimination based upon race in her communication to Bondi and Matulula.

II.	Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).  The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

III.   Discussion

Retaliation Claim

Jefferson contends that Ms. Locke cannot maintain a retaliation claim under Title VII, because she did not engage in a "protected activity;" and, even if she had engaged in a "protected activity," she cannot demonstrate a causal connection between the "protected activity" and her termination. Specifically, Jefferson asserts that Ms. Locke never placed it on any notice of racial discrimination. Ms. Locke argues that she did make specific complaints regarding racial discrimination.

To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an

adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), as amended (Sept. 13, 2006).

   *i.*     *PHRC Charge*

With regards to the PHRC charge itself, the evidence of record establishes that Locke never filed a complaint or charge with either the EEOC or PHRC prior to her termination. The only documentary evidence produced by Ms. Locke suggesting that she contacted the PHRC is an unsigned amended complaint and a questionnaire. (ECF No. 43-9). Ms. Locke produces no evidence that Jefferson received any transmission of her unsigned PHRC amended complaint or questionnaire. Further, both Bondi and Matulula confirm that neither received any notice from the PHRC prior to their decision to terminate Ms. Locke. (ECF Nos. 46 and 47).

A plaintiff must participate in a protected activity to establish a retaliation claim. *Mufti v. Aarsand & Co., Inc.*, 667 F.Supp.2d 535, 552 (W.D. Pa. Oct. 22, 2009). The anti-retaliation provision of Title VII protects an employee who participates in certain Title VII proceedings (the "participation clause") as well as those who oppose discrimination under Title VII (the "opposition clause"). *Moore,* 461 F.3d at 341. Under either type of activity, the employee must hold an objectively reasonable belief, in good faith, that the activity she opposes is unlawful under Title VII. *Id*. Where a plaintiff participated in the protected conduct, the plaintiff must establish evidence that "the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

Here, even if the unsigned and unfiled PHRC amended complaint and/or the questionnaire were to amount to a protected activity, the evidence of record does not reflect that

Jefferson had specific notice of any written communications or documents that Locke had transmitted to the PHRC or that the PHRC had transmitted to her.  Thus, Locke cannot meet her burden to establish any question of fact that Jefferson knew of any written PHRC charge before it decided to discharge her.  Without such notice of the protected conduct, Ms. Locke's retaliation claim, as regards the written PHRC charge, fails.

Accordingly, Jefferson's Motion for Partial Summary Judgment, as regards retaliation for the written PHRC Complaint, will be granted.

    ii.    *Notice of intent to file a PHRC Charge*

Ms. Locke also argues that she placed Jefferson on notice of her intent to file a PHRC charge through her conversations with Bondi and Matulula.  Ms. Locke testified that she told Mr. Bondi and Mr. Matulula that she intended to file a charge of discrimination with the PHRC. (ECF No. 48-1 at p. 18-19).  When questioned about the PHRC charge that she allegedly filed on November 27, 2017, Ms. Locke testified as follows:

> Q: Tell me what you recall you told King [Matulula].
>
> A: I walked into his office, and I asked him, can I speak to him, and he said, "Yes." And I told him, I said, "I feel as though I am being discriminated against, because of different things, you all keep calling me into the office." And he looked right at me, and he said to me, "I'm sorry you feel that way." That was his exact words.
>
> Q: Was there any further discussion between you and King —
>
> A: No.

*Id*. at p. 20.  When asked what she told Mr. Bondi about a PHRC charge for racial discrimination, Ms. Locke testified:

> Q: — and [you] told him you were going to file a PHRC charge?
>
> A: Yes.

> Q: What can you tell me about exactly what you told Max [Bondi] regarding your PHRC charge?
>
> A: I told Max, I said, again, "I feel like I am being discriminated against, because I am being written up for someone saying I didn't change a resident, and I did not work that weekend."

*Id*. at p. 22.

To meet a plaintiff's burden for protected activity in a Title VII retaliation claim, "[t]he complaint, whether verbal or written, must specifically relate to the protected conduct being infringed." *Ilori v. Carnegie Mellon Univ.*, 742 F. Supp. 2d 734, 758 (W.D. Pa. 2010); *see Edwards v. Illinois Dept. of Financial*, 210 F.Supp.3d 931, 954 (N.D. 111. 2016) (finding insufficient evidence of protected conduct where plaintiffs alleged threat to file a complaint with the Illinois Dept. of Human Rights never indicated that it was based upon race discrimination). Third Circuit case law is well-settled that "in order to constitute protected activity, a complaint must be specific enough to notify management of the particular type of discrimination at issue." *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 616 (E.D. Pa. 2014); *Sanchez v. SunGard Availability Servs., LP*, 362 Fed.Appx. 283, 288 (3d Cir.2010) (emphasis added). It is not protected activity if the complaint "stops short of referencing a protected characteristic as the basis for the unfair treatment." *Kier*, 72 F.Supp.3d at 616.

Notably, *Mikell v. Marriott Intern., Inc.*, 789 F.Supp.2d 607 (E.D. Pa. May 19, 2011), is analogous to the instant matter. In *Mikell,* the plaintiff was an African American employee of the defendant. *Id*. at 611. He was suspended for falsification of company records. *Id*. at 612. A few days after his suspension, the plaintiff's lawyer sent a letter asking the employer to review the circumstances surrounding the suspension, and indicating that the plaintiff "would like to return to work without taking further action to address what he believes may be illegal discrimination in the workplace." *Id*. at 612. During the suspension, the plaintiff complained that he was being

8

"discriminated against" and believed there was a "conspiracy to terminate him." *Id*. A week later, following the conclusion of a company investigation, the plaintiff was terminated. *Id*. The Court in *Mikell*, concluded that neither the informal complaints made by the plaintiff during the investigation nor the letter sent by his lawyer constituted protected activity for purposes of a prima facie case of retaliation under Title VII. *Id*. at 619. The court noted that there was no mention of a protected class or any allegation of race-based discrimination in either communication. *Id*.

Likewise, in the instant matter, viewing the testimony in a light favorable to the plaintiff, Ms. Locke only conveyed to her superiors the generic term "discrimination" in relation to her stated intent to file a PHRC charge. According to her own testimony, she did not identify race as the basis for her discrimination communication. Therefore, without evidence that she described race-based discrimination or some other protected activity in her communications to Biondi and Matultla, Ms. Locke does not present any question of material fact to satisfy her burden that she engaged in a protected activity through her indications of intent to file a PHRC charge. Absent a protected activity, she cannot support her retaliation claim.

Accordingly, Jefferson's Motion for Partial Summary Judgment, as regards retaliation for any verbal notice to Jefferson of an intent to file a PHRC charge, will be granted.

    iii.    *Internal Complaints*

Locke also contends she made internal complaints of race discrimination and harassment based upon coworker conflicts and disciplinary matters. Locke testified that she stated to Matulula and Bondi that she felt she was being discriminated against "because you keep calling me into your office" or "because I'm being written up." (ECF No. 48-1 at p. 22). Ms. Locke also testified that on November 20, 2017, she complained to her manager, Mr. Bondi, about

9

"discrimination." *Id*. at p. 57.  Ms. Locke also requested from him information for the ombudsman and asserts that he showed her the number on a hallway sign. *Id.* at p. 21.  She asserts that she did not call the number; rather, she emailed corporate sometime after she made the PHRC charge. *Id*. at pp. 28-29, 33.  She did not produce the email in discovery, notwithstanding requests from defense counsel. In her deposition, she testified that her email to corporate contained an explanation about her interactions with Caucasian female coworkers from the 7:00 to 3:00 and how they felt she was harassing them because she would complain to Matulula. *Id.* at pp. 30-31. She also testified as to her "discrimination" complaint as follows:

> Q: And do you recall what your specific complaint was to Max, on that date?
>
> A:  Yes. I told him, again, "I feel like I am being harassed from the 7:00 to 3:00 shift, because they keep coming to you telling you that I'm doing this, and doing that, when I was told to do rounds."

*Id.* at p. 57.  Furthermore, when asked whether anyone from the 7:00 to 3:00 shift ever made a racial remark to her, Ms. Locke responded "nothing specifically to me." *Id.* at p. 58.

Ms. Locke also testified that she complained to Matulula and accused him of favoring Caucasian employees over her.  *Id.* at pp. 32, 63 to 66.   The other employees about whom she complained were Caucasian.  She testified that she told Matulula that he was always "sticking up" for the 7:00 to 3:00 shift; however, she did not know whether Matulula ever called them into his office. *Id*. at pp. 32-33, 63-66. Her testimony regarding this conversation with Matulula does not indicate that she used the word Caucasian or any other reference to communicate that race was an issue of concern to her.

In addition, Ms. Locke contends that her coworkers harassed her because of race.  She testified as follows:

> Q: So going back to Sienna and Kerisa for a moment, did either Sienna or Kerisa ever say anything to you that caused you to believe that they were discriminating against you, or harassing you, in some way because of your race?
>
> A: Nothing — they didn't say anything specific to me, but they have mentioned to another resident, because she talked to me, the resident, one of the residents. She was a Caucasian resident.
>
> Q: Okay. And what resident was that?
>
> A: Kim — Kim Corbely, Coberly, something like that.
>
> Q: Was she one of the 11 residents you were responsible for?
>
> A: Yes.
>
> Q: Okay. So who said something to Kim Coberly?
>
> A: Kerisa and Sienna.
>
> Q: And what did they say to Kim Coberly, that Kim Coberly reported to you?
>
> A: Kim Coberly reported to me, she said that "Sienna and Kerisa feel as though you are out to get them, and they said, 'I am going to get her, before she gets me.'"
>
> Q: And did Kim Coberly report to you that Kerisa or Sienna said anything about your race in connection with that comment?
>
> A: No. Not to me, she didn't.

*Id.* at p. 64. This testimony does not support Ms. Locke's contention that any of the conduct or communications at issue was due to race discrimination or protected activity by the Plaintiff.

The Third Circuit has held that general complaints of unfair treatment are insufficient to qualify as protected activity under Title VII. *See Daniels v. School Dist. of Phila*, 776 F.3d 181, 195 (3rd Cir. 2015) (general complaints of unfair treatment do not translate into protected activity under Title VII); see e.g., *Mikell v. Marriott Intern., Inc.*, 789 F.Supp.2d 607, 618 (E.D. Pa. May 19, 2011) ("Complaints must be specific enough to notify management of the particular type of discrimination at issue in order to constitute 'protected activity'").

11

Ms. Locke's subjective belief that she was terminated in retaliation for her alleged complaints of being "discriminated against" does not meet the level of a "protected activity" because she never mentions race in any of her comments to management. A review of her testimony only demonstrates Locke's generalized complaints of work write-ups or about reciprocal complaints to management by and between her and her co-workers.  There is no evidence that Ms. Locke ever expressly complained to her employer that she was being discriminated against or harassed because of her race. Under these circumstances, Ms. Locke's "complaints" are insufficient.  Her general statements do not qualify as protected opposition to racial discrimination. Nothing about Ms. Locke's "complaints" to Jefferson's management would be reasonably interpreted as opposition to or complaints about race discrimination.  In addition, her statements do not support any inference that Jefferson management knew she was complaining of race discrimination.  Ms. Locke's testimony describes generalized workplace complaints, which are not protected under Title VII.  Therefore, Ms. Locke has failed to articulate that her internal complaints amount to a "protected activity" sufficient to place Jefferson on notice that she was complaining of a particular form of discrimination, i.e. race. Thus, without a "protected activity," Ms. Locke cannot maintain a claim for retaliation under Title VII.

Accordingly, Jefferson's Motion for Partial Summary Judgment, as regards retaliation for internal complaints, will be granted.

IV.   Conclusion

Upon consideration of the foregoing, Jefferson's Motion for Partial Summary Judgment will be granted.  Judgment will be granted in favor of Jefferson as to Count I.

A separate order will follow.

Date: May 19th, 2020

Marilyn J. Horan
United States District Judge